## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| DAN ROBSON, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | No. 24-2083-KHV |
| | ) | |
| NETSMART TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

On March 3, 2024, Dan Robson filed suit against his former employer, Netsmart Technologies, Inc., alleging disability discrimination and retaliation in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. This matter comes before the Court on Defendant's Motion For Summary Judgment (Doc. #39) filed February 14, 2025. For reasons stated below, the Court sustains defendant's motion.

## Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625

F.3d 1279, 1283 (10th Cir. 2010).  Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which the nonmoving party carries the burden of proof.  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).  To carry this burden, the nonmoving party may not rest on the pleadings but must instead set forth specific facts supported by competent evidence.  Nahno-Lopez, 625 F.3d at 1283.

In applying these standards, the Court views the factual record in the light most favorable to the party opposing the motion for summary judgment.  Dewitt v. Sw. Bell Tel. Co., 845 F.3d 1299, 1306 (10th Cir. 2018).  The Court may grant summary judgment if the nonmoving party's evidence is merely colorable or not significantly probative.  Liberty Lobby, 477 U.S. at 250–51. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251–52.

## Factual Background

The following facts are undisputed or, where disputed, viewed in the light most favorable to plaintiff, the non-movant.

Netsmart is a healthcare software company that develops technology and provides services that support individualized and value-based care for community-based and post-acute healthcare organizations.  Between February 7, 2022 and September 1, 2023, defendant employed plaintiff as Vice President of Client Alignment.  In that role, plaintiff led a team responsible for maintaining and growing relationships with existing Netsmart clients.  Plaintiff's role involved two primary areas: (1) uplifting legacy clients to Netsmart's go-forward program and (2) adding sales of

ancillary products to existing clients.

Before taking this position, plaintiff did not have sales experience in the healthcare information technology industry, but he did have extensive sales experience in pharmaceuticals. Because of this experience and because he sought an executive position, Netsmart believed that plaintiff would be able to quickly learn the business and lead his team to success. Paul Anderson, plaintiff's first supervisor, and Scott Green, another Netsmart executive, told plaintiff that the position would not be easy, however, and that it would be "really difficult" for anyone. Deposition Of Dan Robson (Doc. #43-2) filed March 14, 2025 at 35:1–2.

For two years prior to plaintiff's employment, Brad Carey—who never disclosed a disability to Netsmart—was plaintiff's predecessor as Vice President of Client Alignment. Since 2018, Netsmart's Post-Acute Client Alignment business unit had been struggling due to issues with new product, under-investment by its ownership group and the COVID pandemic. The unit had not hit 100 per cent of its sales numbers since 2019.

In April of 2022, roughly two months into his employment, plaintiff was diagnosed with prostate cancer, which he disclosed to Netsmart's executive team. To treat his cancer, plaintiff had surgery, which required him to take two weeks off work. Netsmart approved plaintiff's time off and did not give him any problems about being out of the office or off work to recover. For a seven-week period from approximately May to July of 2022, while he had radiation treatment, plaintiff could not travel for work. Other than being unable to travel, plaintiff's cancer diagnosis and treatment did not impact his ability to do his job.

Plaintiff's sales performance depended on his team's performance, so he was not solely responsible for his sales goals and metrics. For the last three quarters of 2022, plaintiff met 34 per cent, 43 per cent and 63 per cent, respectively, of his sales goals, and his variable compensation

plan showed attainment of 37.7 per cent, 46.5 per cent and 64.4 per cent, respectively.  In 2023, Netsmart reduced the sales goals for the entire Post-Acute Client Alignment business unit "because everyone was struggling."  Deposition Of Dawn Iddings (Doc. #43-3) filed March 14, 2025 at 21:13–14.  After the reduction, plaintiff exceeded his sales goal for the first quarter of 2023, but his sales performance in the second quarter was not as strong.  In late 2022 or early 2023, the sales manager who reported to plaintiff and led the sales team resigned, and Netsmart did not let plaintiff backfill the position.  After that, plaintiff had to lead the sales team in addition to the rest of the Client Alignment division, which required double effort.

Netsmart had a merit rating system which consisted of top, middle and bottom bands.  Plaintiff's first supervisor, Paul Anderson, rated plaintiff in the middle band for the period from April 1, 2022 to February 16, 2023.  Because they communicated often, Mr. Anderson believed that plaintiff was aware of his performance struggles, so he did not feel that it was necessary to put plaintiff's struggles "on paper."  Deposition Of Paul Anderson (Doc. #40-4) filed February 14, 2025 at 78:19.

As early as April of 2022, Netsmart's leadership was concerned that plaintiff was struggling to understand Netsmart's business, processes and industry.  Plaintiff's supervisors, Mr. Anderson and Dawn Iddings, observed that he struggled to push work forward on his own.  They believed that plaintiff could follow a script, but that he needed his supervisors to tell him what to do next.  Netsmart expected an executive at plaintiff's level to "be able to come up with those tactics on his own and to drive them without supervision."  Id. at 44:16–17.

Others at Netsmart, usually Mr. Anderson and Ms. Iddings, had to cover certain situations or aspects that plaintiff was not yet able to cover independently without tactical guidance.  Nevertheless, Netsmart tried to support plaintiff's growth.  For example, Mr. Anderson recognized

that not everyone learns the same way, explaining that some people learn better reading, some people learn better hands-on, some people need repetition and that they "were trying it all" with plaintiff. Id. at 47:1. Plaintiff received only sporadic and limited feedback regarding his performance from his first supervisor, Mr. Anderson, and plaintiff notified Ms. Iddings and Human Resources of his disappointment in the lack of coaching and direction. In the latter half of 2022, plaintiff received praise on his momentum, leadership and results following his quarterly review from senior leaders at Netsmart, including Chief Operating Officer Tom Herzog.

In February of 2023, Ms. Iddings became plaintiff's new supervisor. On March 21, 2023, she told plaintiff by email, "We are turning a corner and every quarter is going to keep getting better!" Iddings Email Dated March 21, 2023 (Doc. #43-9) filed March 14, 2025 at 2. On April 1, 2023, Ms. Iddings awarded plaintiff a 2.7 per cent annual merit increase, although she was not required to award him an increase if she did not think that he deserved one. On an unspecified date in April of 2023, Ms. Iddings met with plaintiff for his quarterly review and told him that by this time next year, she viewed him as becoming her "right hand" and joining the senior executive leadership committee. Robson Deposition (Doc. #43-2) at 59:2. On an unspecified date, Ms. Iddings and plaintiff traveled together to Dallas, Texas to meet with a client, and Ms. Iddings complimented plaintiff's read on the situation and approach in dealing with the difficult client. On May 11, 2023, Ms. Iddings acknowledged that the business unit had "made some good turns to accelerate our level of activity and our sales rigor" and expressed a desire to "crank up the dial even further." Iddings Email Dated May 11, 2023 (Doc. #43-11) filed March 14, 2025 at 2.

On an unspecified date in mid-May of 2023, plaintiff told Ms. Iddings that his prostate cancer had returned and that he would not be able to travel for seven weeks while undergoing treatment. To receive his treatment, plaintiff only had to remain in town—he did not otherwise

have any physical limitations.  Without hesitation, Ms. Iddings told plaintiff that it would be no problem, and that she would personally cover any of his travel.  On an unspecified date, plaintiff also consulted with Michelle Callstrom in HR concerning his request not to travel during radiation treatment.  Netsmart granted plaintiff his requested accommodation and allowed him to not travel during his treatment.  Because he typically scheduled his treatments in the morning before he went to the office, plaintiff missed little (if any) work.  No one at Netsmart ever suggested to plaintiff that his cancer treatment or temporary inability to travel was a problem or interfered with his ability to do his job.  In fact, other than expressing support for plaintiff, no one at Netsmart made any comments about his cancer—either after he was originally diagnosed or after he began radiation treatment.  Plaintiff never told anyone at Netsmart that he believed his cancer diagnosis or treatment impacted his ability to do his job.

When Ms. Iddings took over from Mr. Anderson as plaintiff's supervisor, she provided plaintiff a lot of feedback which pertained to the division having struggled for some time, including prior to plaintiff's tenure.  For example, in May of 2023, Ms. Iddings told plaintiff that his team was "not getting enough executive meetings, in person or remote, to connect with [Netsmart's] targets."  <u>Robson Deposition</u> (Doc. #40-2) at 61:4–6.  Plaintiff had difficulty increasing executive meetings because clients wanted to see improvements to the Netsmart products they were already using, and some clients were not interested in meeting because they were dissatisfied with Netsmart products.  Additionally, plaintiff could not travel while receiving radiation treatment from late May to mid-July of 2023.

In May of 2023, plaintiff sought support in closing a deal from Sonya Vickers, Senior Director of Contract Management, on behalf of a sales team member who had been with the company for less than a year.  Plaintiff also sought support from Ms. Vickers because some of the

contract processes had recently changed.  On June 8, 2023, plaintiff asked Ms. Vickers if she could lead a "Contracts 101 Session" for him and his team to walk them through the basics of contracts, including where to find them, what to focus on when reviewing them and when to be proactive with the client and extend the contract.  On June 27, 2023, plaintiff sent Ms. Vickers an email asking her to begin pulling together an amendment for one of plaintiff's clients.  Plaintiff did not provide the necessary information for Ms. Vickers to do so, however, and Netsmart expected plaintiff to provide the business terms before the contract team could provide support.

For approximately three or four weeks beginning in early or mid-June of 2023, Ms. Iddings and Mr. Anderson began exploring other possible opportunities and roles in which plaintiff could be more successful.  For instance, Netsmart looked into another position in sales that required less self-direction and usually followed a defined process that was repeatable.  Netsmart considered transferring plaintiff to the care guidance group, which is a less complex area of Netsmart business that does not focus on sales.  Netsmart spoke to the leaders of various departments to try to find a new place for plaintiff.  Group leaders reported that individuals who had worked with plaintiff did not have confidence that he could perform in the prospective roles, and they did not want a problem to be passed on.

On June 29, 2023, Ms. Iddings checked in with plaintiff about the status of deals heading into the last day of the quarter.  Given the outstanding matters, she questioned why plaintiff had planned to take a vacation day on the last day of the quarter.  Ms. Iddings told plaintiff that they needed to discuss the way a specific deal "went down," and she told plaintiff that as the relevant point person, he was not working to close the deal, so she had to take over.  Iddings Email Dated June 29, 2023 (Doc. #40-10) filed February 14, 2025 at 2.  She explained that "there is no way we can run quarter end deals with me driving them all."  Id.  Plaintiff acknowledged that it was his

responsibility to close the deal, and he questioned Ms. Iddings feeling the need to jump in.  He also explained that it was impossible to close the deal by the end of the quarter.  Due to "all the loose ends," however, he decided to work on the last day of the quarter.  Robson Email Dated June 29, 2023 (Doc. #40-13) filed February 14, 2025 at 2.

On June 30, 2023, the last day of the quarter, Ms. Iddings provided plaintiff feedback regarding his end-of-quarter performance.  Ms. Iddings told plaintiff that he was "tracking and reporting the news about client activity and sales" when his job was "to create and write the news." Iddings Email Dated June 30, 2023 (Doc. #40-9) filed February 14, 2025 at 2.  Ms. Iddings then discussed three specific deals which she felt that plaintiff had failed to effectively manage at the end of the quarter, discussing what was missing and what she did to try to help the team close the deal.  Ms. Iddings also reminded plaintiff that the entire team needed direction and leadership, and that they had to lead the team by example and do the work themselves.  Ms. Iddings also reminded plaintiff that he had to have himself and the entire team on the field when they closed out a quarter and told him that she did not understand why his team's attendance continued to be a problem. That same day, plaintiff emailed Ms. Iddings acknowledging that her feedback was fair and specific on each account, and that this level of detail was what he needed to address to improve his leadership, performance and his team performance.  In his communications with Ms. Iddings, plaintiff did not offer any excuse or explanation for his performance.

On an unspecified date in early July of 2023, following their communications at the end of the second quarter, Ms. Iddings had an in-person conversation with plaintiff.  Ms. Iddings told plaintiff that they were not making sales numbers, and asked plaintiff how they could all do better. Plaintiff told Ms. Iddings that "you know there's new people . . . I don't know that we have enough time for the entire division to be trained up quick enough to hit our numbers."  Robson Deposition

(Doc. #40-2) at 106:17–21. Ms. Iddings believed that plaintiff was giving up and that he did not understand Netsmart culture and processes, or how to construct deals and negotiate contracts, which were two critical elements of his job. She did not provide plaintiff direction or resources, however, to help him better understand Netsmart culture and processes. Ms. Iddings decided that she could not invest any more time in a vice president who did not know how to construct deals and negotiate contracts on his own. Ms. Iddings suggested that she would look into other areas of the company where plaintiff could be successful.

On July 2, 2023, Ms. Iddings emailed Mr. Anderson, Wendy Hill (Chief People Officer) and Mr. Herzog (Chief Operating Officer) about transitioning plaintiff out of his role. Ms. Iddings had already spoken with Chief Executive Officer Mike Valentine regarding plans to backfill plaintiff's position. On July 6, 2023, Ms. Iddings spoke to plaintiff about his fit for his role and asked him if he felt that he could be successful in a different part of the company.

On July 11, 2023, Ms. Iddings and Mr. Anderson decided to terminate plaintiff's employment. Ms. Iddings wanted to deliver the news to plaintiff before a companywide sales event that was set to begin on July 24, 2023. Plaintiff told Ms. Iddings that he understood. He did not try to argue, say it was unfair or say that she was wrong. Plaintiff did not mention his cancer or challenge Netsmart's decision on the basis that he thought it was related to his cancer.

After terminating plaintiff's employment in July of 2023, Netsmart rehired Mr. Carey as Senior Vice President of Client Alignment and promoted Matt Nielsen to Senior Director of Client Alignment. The two of them took over plaintiff's job responsibilities. Neither Mr. Carey nor Mr. Nielsen ever disclosed a disability to Netsmart. Mr. Carey voluntarily retired in September of 2024, and Netsmart never considered disciplining him or terminating his employment based on continuing performance issues in the Post-Acute Client Alignment business unit.

-9-

In May of 2024, Netsmart also terminated Ms. Iddings, plaintiff's supervisor, due to the performance of the Post-Acute Client Alignment group. Like plaintiff, Ms. Iddings did not receive formal notice that Netsmart was considering termination. Ms. Iddings never disclosed a disability to Netsmart.

Plaintiff testified that he had no evidence that Netsmart terminated his employment because of his cancer, but he believes that it was "unusual" that they decided to terminate his employment while he was getting treatment. Robson Deposition (Doc. #40-2) at 124:19. Mr. Anderson and Ms. Iddings both testified that plaintiff's cancer diagnosis and treatment played no role in their assessment of plaintiff's job performance at Netsmart or their decision to terminate his employment.

On March 8, 2024, plaintiff filed suit against defendant, asserting two claims under the ADA. Specifically, plaintiff alleges that in violation of the ADA, (1) defendant discriminated against him by terminating his employment because of his disability; and (2) in retaliation for his request not to travel while undergoing cancer treatment, defendant terminated his employment. Pretrial Order (Doc. #36) filed January 13, 2025 at 14–15. On February 14, 2025, defendant filed its motion for summary judgment. See Defendant's Motion For Summary Judgment (Doc. #39).

## Analysis

Defendant seeks summary judgment on plaintiff's two claims, arguing that (1) because plaintiff has not produced evidence from which a reasonable jury could conclude that defendant fired him because of his prostate cancer or treatment, plaintiff cannot demonstrate a prima facie case of disability discrimination; (2) because plaintiff cannot show a causal connection between his request to not travel while undergoing cancer treatment and defendant's termination of his employment, plaintiff cannot establish a prima facie case of retaliation; and (3) plaintiff cannot

show that defendant's articulated legitimate, nondiscriminatory reasons for terminating his employment were pretextual.

## I.    Disability Discrimination

Plaintiff asserts that in violation of the ADA, defendant discriminated against him based on disability by terminating his employment.  Defendant seeks summary judgment, arguing that plaintiff cannot establish a prima facie case of disability discrimination or show that defendant's articulated legitimate non-discriminatory reasons for terminating his employment were pretextual.

Absent direct evidence of discrimination, the Court uses the McDonnell Douglas burden-shifting framework to evaluate an employment discrimination claim under the ADA.  Lincoln v. BNSF Ry. Co., 900 F.3d 1166, 1192 (10th Cir. 2018); see McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  To establish a prima facie case of disability discrimination, plaintiff must show that (1) he is disabled within the meaning of the ADA, (2) he is qualified to perform the essential functions of his job with or without accommodation and (3) he suffered adverse employment action because of his disability.  Edmonds-Radford v. Sw. Airlines Co., 17 F.4th 975, 989–90 (10th Cir. 2021).  If plaintiff can establish a prima facie case, the burden shifts to defendant to offer a legitimate, non-discriminatory reason for the termination.  Id. at 990.  If defendant does so, the burden shifts back to plaintiff to show a genuine issue as to whether defendant's reason was pretextual.  Id.

Here, defendant does not contest the first two elements of plaintiff's prima facie case. Rather, defendant argues that plaintiff cannot establish that he suffered adverse action because of his disability or that its proffered reason for terminating his employment was pretextual.

### A.    Whether Plaintiff Can Establish A Causal Connection

The Court's inquiry on the third element focuses on whether the circumstances surrounding

-11-

the termination "give rise to an inference" that it was based on plaintiff's disability.  Lincoln, 900 F.3d at 1192–93.  To create an inference of discrimination, plaintiff must "present some affirmative evidence that his disability was a determining factor in the employer's decision."  Id. at 1193.  If plaintiff can show that the termination occurred shortly after he announced his disability, he can rely on temporal proximity to establish causation.  Smith v. Millennium Rail, Inc., 241 F. Supp. 3d 1183, 1203 (D. Kan. 2017).  Here, to establish causation, plaintiff relies on (1) temporal proximity and (2) the fact that defendant replaced him with people who had no apparent disabilities.

As to temporal proximity, plaintiff has presented evidence that (1) in mid-May of 2023, plaintiff informed Ms. Iddings that his prostate cancer had returned and that he would be unable to travel for seven weeks and (2) on July 11, 2023, less than two months later, defendant decided to terminate plaintiff's employment.  Plaintiff first announced his cancer diagnosis in April of 2022, however, more than a year before defendant terminated his employment.  Defendant therefore knew about plaintiff's cancer diagnosis for more than a year before it decided to terminate his employment.  During the interim, defendant approved time off for plaintiff to have surgery and supported him being off work to recover.  In mid-May of 2023, when plaintiff notified his supervisor that his cancer had returned, his supervisor told him that his inability to travel for seven weeks was not a problem.  Plaintiff presents no evidence that his inability to travel presented issues for him or defendant.

As noted, an employee can rely on temporal proximity to create an inference of discrimination if the adverse action happens shortly after he announces his disability.  Smith, 241 F. Supp. 3d at 1203.  Where plaintiff has already taken leave for his disability and the employer has been aware of his disability for "quite some time" before terminating his employment,

however, plaintiff is "unable to rely on temporal proximity" and "must point to some other evidence" suggesting that defendant terminated his employment because of his disability.  Id.

As to other evidence, plaintiff has presented evidence that defendant replaced him with Mr. Carey and that Mr. Carey and Mr. Nielsen, who never disclosed disabilities to defendant, took over plaintiff's job responsibilities.  In support, plaintiff cites a case in which the Tenth Circuit held that a Title VII sex discrimination plaintiff could establish causation by showing that she was replaced by a male (someone outside her protected class).  Toth v. Gates Rubber Co., 216 F.3d 1088, 2000 WL 796068, at *7 (10th Cir. 2000).  The Tenth Circuit, however, has not applied this reasoning to disability discrimination claims.  Plaintiff's evidence does not create an inference of discrimination, however, because the record contains no evidence that (1) plaintiff's seven-week inability to travel affected his performance in any way or that defendant had any problem with his inability to travel or (2) defendant considered anyone's disability status in its decision-making. Furthermore, in terms of comparisons, defendant also fired Ms. Iddings, who was not disabled. The evidence on comparators is inconclusive at best and does not give rise to an inference of discrimination.

Plaintiff cannot rely on temporal proximity to establish causation, and the evidence which he cites does not otherwise raise an inference that defendant considered plaintiff's disability in deciding to terminate his employment.  Accordingly, plaintiff has not established a prima facie case of disability discrimination.

     B.    Whether Plaintiff Can Establish Pretext

Defendant argues that it terminated plaintiff's employment because of sustained and documented performance issues, such as his failure to meet Netsmart sales goals and inability to drive his team to success, which are legitimate, nondiscriminatory reasons for plaintiff's

-13-

termination.  Plaintiff responds that defendant's proffered reasons are pretext for illegal discrimination, and that defendant terminated his employment because of his disability.

To establish pretext, "plaintiff must present evidence that defendant did not really believe its proffered reason for terminating him and thus may have been pursuing a hidden discriminatory agenda." Dewitt v. Sw. Bell Tel. Co., 845 F.3d 1299, 1307 (10th Cir. 2017) (internal quotations omitted).  Plaintiff can establish pretext by showing "weakness, contradictions, or inconsistencies" in defendant's reasons "such that a reasonable jury could find them unworthy of belief."  Id. Temporal proximity alone is insufficient to create an issue of fact whether defendant's stated reason for termination was pretextual.  Selenke v. Med. Imaging of Colorado, 248 F.3d 1249, 1266 (10th Cir. 2001).

To assess whether defendant's proffered reason is pretextual, the Court examines the facts as they appeared to the decision makers and does not second-guess defendant's business judgment. Edmonds-Radford, 17 F.4th at 991.  It does not matter whether defendant's assessment that plaintiff was not performing well was "wise, fair or correct"—it only matters whether defendant honestly believed that plaintiff was not performing well and acted in good faith on that belief. Dewitt, 845 F.3d at 1310.  "Evidence that the employer should not have made the termination decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility." Id. at 1307.

Plaintiff argues that defendant's proffered reasons for terminating his employment are pretextual because (1) defendant's criticisms of his failure to meet sales goals are disingenuous, (2) defendant has offered varying accounts of who was involved in plaintiff's termination and when the termination decision was made and (3) defendant subjected him to heightened scrutiny following his disclosures of cancer diagnoses.

-14-

Plaintiff's argument that defendant's criticisms are disingenuous does not create a genuine issue of material fact as to pretext. Plaintiff offers excuses for his team's performance and evidence that he was in fact performing well. Specifically, plaintiff argues that (1) he was not solely responsible for his sales targets and performance because his performance depended on his team, (2) the Post-Acute Client Alignment business unit had not been hitting its annual sales numbers at 100 per cent since 2019 and continued not to meet it well after plaintiff's tenure and (3) before defendant hired plaintiff, Mr. Carey had failed to lead the unit to meet sales goals, yet defendant re-hired Mr. Carey and did not discipline him or consider terminating his employment based on failure to meet sales goals.

As noted, defendant terminated both plaintiff and Ms. Iddings because of poor performance in the Post-Acute Client Alignment business unit, and because of its history, plaintiff's job was one that would be "really difficult" for anyone. Robson Deposition (Doc. #43-2) at 35:1–2. Defendant's expectations for plaintiff may have been unrealistic given this history, but plaintiff presents no evidence that defendant did not honestly believe that plaintiff was not living up to its performance expectations. The record does not support plaintiff's claims that criticisms of his performance were "disingenuous."

Next, plaintiff argues that defendant has offered varying accounts of who decided to terminate his employment. The record on this issue, however, does not establish a genuine issue of material fact whether defendant's reasons for terminating his employment were pretextual. An employer hiding or refusing to disclose who was responsible for the termination decision can cast doubt on its proffered reason. Paup v. Gear Prods., Inc., 327 F. App'x 100, 112 (10th Cir. 2009). Defendant has stated, and the record clearly reflects, that on July 11, 2023, Ms. Iddings and Mr. Anderson decided to terminate plaintiff's employment. Plaintiff has presented evidence that

-15-

additional people were involved in the decision-making process, but this evidence does not show that defendant refused to name decision-makers or take responsibility for its decision. The fact that other individuals were involved does not create a genuine issue of material fact as to pretext.

Finally, plaintiff argues that defendant subjected him to heightened scrutiny following his disclosures of cancer diagnoses. This argument also fails to establish a genuine issue of material fact whether defendant's reasons for terminating his employment are pretextual. The record reflects that plaintiff received praise from a senior leader and the Chief Operating Officer in the latter half of 2022 and positive encouragement and feedback from Ms. Iddings in March, April and May of 2023, followed by negative feedback and criticism in June and July of 2023. This chronology, however, does not suggest that defendant subjected plaintiff to "heightened scrutiny" after he disclosed his disability and requested an accommodation. Defendant has provided evidence that (1) plaintiff's job was a tough one, (2) plaintiff took the job with no sales experience in the healthcare information technology industry, in a unit that was already struggling, (3) plaintiff struggled to understand defendant's business practices and industry, (4) plaintiff failed to turn around his under-performing unit and (5) defendant could not find another internal position for him. Plaintiff has presented no evidence that defendant's evaluations of his performance were disingenuous, and in fact, the record suggests that before defendant fired him, he concurred in the evaluations. The change from positive encouragement to negative feedback is entirely consistent with defendant's observation that plaintiff was not growing into his executive role as it had hoped, and it becoming increasingly frustrated with that fact.

It bears re-emphasis that defendant made no comments about plaintiff's disability and granted his accommodations for time off and relief from a need to travel. It assured him that it was not a problem, and the record contains no evidence that it was a problem. The record also

contains no evidence that plaintiff's disability affected his performance in any way. Defendant made efforts to place plaintiff in other positions where he could be more successful. Other group leaders were not willing to accept plaintiff, and the record contains no evidence that they declined to accept him for retaliatory or discriminatory reasons or that they were even aware of his disability or requested accommodations. Plaintiff has not created a genuine issue of material fact whether defendant's proffered reasons for terminating his employment were pretextual. Accordingly, the Court sustains defendant's motion for summary judgment on plaintiff's disability discrimination claim.

## II.    Retaliation

Plaintiff asserts that in violation of the ADA, defendant terminated his employment because he requested a reasonable accommodation not to travel for seven weeks while he was undergoing radiation treatment. Defendant seeks summary judgment on plaintiff's retaliation claim, arguing that he cannot establish a prima facie case of retaliation or show that defendant's articulated legitimate non-discriminatory reasons for terminating his employment were pretextual.

The Court analyzes plaintiff's retaliation claim under the familiar McDonnell Douglas burden-shifting framework. See Lincoln, 900 F.3d at 1209. Under the ADA, to establish a prima facie case of retaliation, plaintiff must prove that (1) he engaged in a protected activity, (2) he was subject to adverse employment action subsequent to or contemporaneous with the protected activity and (3) a causal connection exists between the protected activity and adverse employment action. Foster v. Mountain Coal Co., LLC, 830 F.3d 1178, 1187 (10th Cir. 2016). If plaintiff can establish a prima facie case, the burden shifts to defendant to offer a legitimate, non-discriminatory reason for the termination. Id. at 1193–94. If defendant does so, the burden shifts back to plaintiff to show a genuine issue as to whether defendant's reason was pretextual. Id. at 1193.

-17-

Here, defendant does not contest the first two elements of plaintiff's prima facie case of retaliation but argues that plaintiff cannot establish the third element (a causal connection between plaintiff's request for accommodation and defendant's decision to terminate his employment) or show that defendant's reason was pretextual.

> A.    Whether Plaintiff Can Establish A Causal Connection

Defendant argues that plaintiff cannot establish his prima facie case of retaliation because he cannot show a causal connection between his protected activity and defendant's termination of his employment.

Plaintiff's request for an accommodation for his disability constitutes protected activity. Lincoln, 900 F.3d at 1209.  If adverse action closely follows protected activity, the Court may infer discriminatory motive, and plaintiff may rely solely on temporal proximity to show causation at the prima facie stage.  Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999); Foster, 830 F.3d at 1191.  The Tenth Circuit has held that temporal proximity of two months may be sufficient to establish a prima facie case of retaliation.  See Webb v. Level 3 Commc'ns, LLC, 167 F. App'x 725, 734 (10th Cir. 2006); Anderson, 181 F.3d at 1179 (one and one-half month period between protected activity and adverse action may by itself establish causation, but three-month period is insufficient).

Plaintiff cannot rely on temporal proximity for his disability claim because he first announced his disability more than a year before defendant terminated his employment.  He can, however, rely on temporal proximity for his retaliation claim.  Plaintiff has presented evidence that he engaged in protected activity—requesting not to travel while undergoing cancer treatment— less than two months before defendant decided to terminate his employment.  Specifically, (1) in mid-May of 2023, plaintiff informed Ms. Iddings that his prostate cancer had returned and

-18-

requested an accommodation not to travel for seven weeks and (2) on July 11, 2023, less than two months later, defendant decided to fire plaintiff.  Plaintiff has therefore demonstrated a genuine issue of material fact whether defendant terminated his employment because of his request for accommodation and established a prima facie case of retaliation.

      B.    <u>Whether Plaintiff Can Establish Pretext</u>

Defendant argues that it terminated plaintiff's employment because of sustained and documented performance issues, such as his failure to meet Netsmart sales goals and inability to drive his team to success, which are legitimate, nondiscriminatory reasons for plaintiff's termination.  Plaintiff responds that defendant's proffered reasons are pretext for illegal discrimination, and that defendant terminated his employment because he requested accommodation.  In support, plaintiff repeats the same arguments: (1) defendant's criticisms of his failure to meet sales goals are disingenuous, (2) defendant has offered varying accounts of who was involved in plaintiff's termination and when the termination decision was made and (3) defendant subjected him to heightened scrutiny following his disclosures of cancer diagnoses.

Because plaintiff repeats the same arguments for pretext, the Court incorporates its previous analysis.  As discussed, plaintiff has not created a genuine issue of material fact whether defendant's proffered reasons for terminating his employment are pretextual.  Accordingly, the Court sustains defendant's motion for summary judgment on plaintiff's retaliation claim.

**IT IS THEREFORE ORDERED** that <u>Defendant's Motion For Summary Judgment</u> (Doc. #39) filed February 14, 2025 is **SUSTAINED.**

Dated this 30th day of May, 2025 at Kansas City, Kansas.

                              <u>s/ Kathryn H. Vratil</u>
                              KATHRYN H. VRATIL
                              United States District Judge